# EXHIBIT 1

**National Discount Merchant Services**
Merchant Account Application
Please type and fill out completely
support@ndmscorp.com | Partner ID

*A Registered ISO/MSP of Chesapeake Bank, Kilmarnock, VA*



Accept Credit Cards. Simply.
310.997.0100 | ndmscorp.com

## Business Information

| | |
|---|---|
| Legal Business Name TT NUTRITION LLC (As registered with IRS) | |
| Legal Address 9119 HIGHWAY 6 STE 230 | |
| City MISSOURI CITY | State TX | Zip 77459 |

## DBA (If Different From Legal)

DBA LURONG LIVING
(If different than Legal / For Cardholder Statements - 23 Max Length)

DBA Address 43 OLD WOODS PSGE

City MISSOURI CITY | State TX | Zip 77459

- ☐ Sole Proprietor
- ☐ Partnership
- ☒ LLC
- ☐ Corporation
- ☐ Government
- ☐ Non-Profit

In Business Since mm/yy 02/19

Descriptor
(If different than DBA / For Cardholder Statements - 23 Max Length)

Federal Tax Identification Number: (EIN or SS#): 38-4108128

Incorporation State: TX

Publicly traded? Symbol: N/A

Customer Service Phone: 888-958-7664

Website Address: WWW.LURONGLIVING.COM

Contact Name: MICHAEL NICE
Contact Email: MNICE@TIMTAM.TECH
Contact Phone: 314-705-9416
Fax: 310-943-1579

Mail statements to my: ☒ Legal  ☐ DBA

☒ By checking this box, you acknowledge that you consent to receiving IRS notices via paperless delivery to the contact email above and have read and agree to Consent to Paperless Delivery of Tax Related Documents, located at ndmscorp.com/irs-consent.

## Processing Summary

**Business Type** (Select the option that best describes your business)

- ☐ Retail
- ☐ Restaurant
- ☐ Service
- ☐ Lodging
- ☐ Field / Mobile
- ☐ Mail / Phone / Catalog
- ☐ Fuel
- ☐ Supermarket
- ☒ Internet
- ☐ Other

☐ Swipe / Card Present (Select how you would like to process cards)
- ☐ Terminal / POS
- ☐ Mobile App (Swipe)

Buying new equipment from NDMS: Yes ☐  No ☐

☒ Non-Swipe / Card-Not-Present (Select how you would like to process cards)
- ☒ Gateway / API
- ☐ Virtual Terminal / e-Terminal
- ☐ Key enter into swipe terminal
- ☐ Voice Authorizations only
- ☐ Mobile App (Non-Swipe)

| Transaction Type | Transactions From | Average Sales Ticket | High Sales Ticket | Average Monthly Volume | High Monthly Volume |
|---|---|---|---|---|---|
| Swipe 0% Non-Swipe 100% | Businesses 10% Consumers 90% | $80 | $2000 | $150000 | $250000 |

☐ Seasonal? Check Peak Month(s):
Jan ☐ Feb ☐ Mar ☐ Apr ☐ May ☐ Jun ☐
Jul ☐ Aug ☐ Sep ☐ Oct ☐ Nov ☐ Dec ☐

Gateway: ☐ NDMS To Setup | ☒ Use Existing
- ☐ ePay Plus
- ☐ USA ePay
- ☐ Cybersource
- ☐ NMI
- ☐ BridegePay
- ☐ Roam Data
- ☒ Authorize.net
- ☐ Other

Refund & Return Policy: Please Describe: REFER TO WEBSITE

Description of Products or Services Sold: NUTRITIONAL SUPPLEMENTS

## Bank Disclosure

**Member Bank (Acquirer) Information**

Acquirer Name: Chesapeake Bank
Acquirer Address: 5000 Foundation Street, Williamsburg, VA 23188
Acquirer Phone: (757) 941-1339

**Important Member Bank (Acquirer) Responsibilities**

1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a Merchant.
2. A Visa Member must be a principal (signer) to the Merchant Agreement
3. The Visa Member is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchants must comply.
4. The Visa Member is responsible for and must provide settlement funds to the Merchant.
5. The Visa Member is responsible for all funds held in reserve derived from settlement.

**Merchant Information**

Merchant's Business Name: TT NUTRITION LLC

**Important Merchant Responsibilities**

1. Ensure compliance with cardholder data security and storage requirements.
2. Maintain fraud and chargebacks below thresholds.
3. Review and understand the terms of the Merchant Agreement.
4. Comply with Visa Operating Regulations.

The responsibilities listed for Member Bank and Merchant do not supersede terms of the Merchant Bankcard Agreement and are provided to ensure the Merchant understands important obligations of each party and that the Visa Member (Acquirer) is the ultimate authority should the Merchant have any problems.

*thomas pepe*
thomas pepe (Mar 27, 2019)

**Merchant's Signature**                    **Date**

thomas pepe

**Merchant's Name and Title**

## Owners and Officers (REQUIRED: See Supplemental A: Beneficial Ownership Certification)

| Principal 1 Name | Position/Title | Principal 2 Name (if applicable) | Position/Title |
|---|---|---|---|
| THOMAS PEPE | CEO | TODD DUNPHY | CSO |

| Social Security # | % Ownership | Social Security # | % Ownership |
|---|---|---|---|
| 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 | 37 | 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 | 37 |

| Home Address ☒Own ☐Rent | Drivers License # | State | Home Address ☒Own ☐Rent | Drivers License # | State |
|---|---|---|---|---|---|
| 2910 MILAM ST APT 1530 | 24153682 | TX | 43 OLD WOODS PASSAGE | 23729885 | TX |

| City, State, Zip | Date of Birth | City, State, Zip | Date of Birth |
|---|---|---|---|
| HOUSTON, TX 77006 | 09/12/1971 | MISSOURI CITY, TX 77459 | 12/03/1975 |

| Principal Phone | Principal Email | Principal Phone | Principal Email |
|---|---|---|---|
| 713-865-3305 | TPEPE@TIMTAM.TECH | 281-627-4886 | TD@TIMTAM.TECH |

Ever filed for bankruptcy (If Yes, submit explanation with application):　☒ Never filed　☐ Business bankruptcy　☐ Personal bankruptcy

## Security

| Do you store card numbers? | ☐ Yes ☒ No | Have you been subject to any ongoing or previous compromise investigations? |
|---|---|---|
| Are you currently PCI DSS compliant? | ☒ Yes ☐ No | ☐ Yes ☒ No　If yes, please explain: |

| Have you ever been identified by any card brand's fraud or risk programs? ☐ Yes ☒ No　If yes, what programs and when? | Have you ever processed bankcards before? ☐ Yes ☒ No　If yes, with whom? |
|---|---|

| Besides your gateway or terminal, identify all other third parties involved in the payment process that may have access to cardholder data: | Do you use a Fulfillment House? ☐ Yes ☒ No　If yes, name of service provider:　Phone Number: |
|---|---|

| Product/Service is received ☐ before or ☒ after card is processed. If after: ☐ Immediately ☒ 1-10 Days ☐ 10-30 Days ☐ 31-90 Days ☐ >90 | Has the business or any of its owners ever been terminated from accepting bankcards? ☒ No ☐ Yes (If Yes, submit explanation with application) |
|---|---|

Visa/MasterCard/Discover/American Express　☒ All Debit & Credit　☐ Debit Only

### PROCESSING

Qualified: 1.99%　|　IDAP: %

MQR　.75%　　NQR　1.50%　　TXN NQ: $　/ea

### ACCOUNT

| Authorization: | $ | .25/ea | Access: | $10 /month |
|---|---|---|---|---|
| AMEX: | $ | .25/ea | Setup: | $25 |
| Batch: | $ | .25/ea | Annual: | $25 |
| Item: | $ | .25/ea | Minimum: | $25 /month |

Refer to Merchant Agreement for complete terms. Interchange or Program Fees and applicable industry category rates apply unless otherwise noted. Interchange, Dues, Assessments, Program and other fees not listed will be passed through directly to merchant. Annual fees billed upon commencement and each anniversary month thereof. Applicable gateway, POS or other software/hardware fees billed separately. Rates, association surcharges and other fees, unless otherwise noted include the following:

| | | |
|---|---|---|
| Qualified Rate: 1.79% – 2.99% (swipe/non-swipe) | Terminal Programming: $29/each (if applicable) | Visa, MasterCard, Discover, Dues & Assessments |
| Mid-Qualified Rate (MQR): 0.99% | BRAM Protection $3.75/month (if applicable) | Cross border and International assessments |
| Non-Qualified Rate (NQR): 1.99% | Platform Processing Fee (PPF) | MC network access/brand usage (NABU) |
| Voice Authorizations: $1.25 each | Retrieval Requests: $15/each | Visa US acquirer processing fee (APF) |
| Address Verification (AVS): $.03 each | Chargebacks: $25/each ($35 if applicable) | Visa Zero Floor Limit (ZFL) |
| Security Fraud (PCI): $.0195 per transaction | Excessive Chargeback Fees (EC, CMM, ECM) | Visa misuse of the authorization system |
| Control Scan PCI Protection $3.95/month (optional) | Per Item, Authorizations, AMEX, Batch: $.25 | Non-AVS match surcharges may apply |
| Per Access point: $10/month (if applicable) | Activation Setup, Annual: $199 | Other bank and card association fees may apply |

## Banking Information (Attached Copy of Voided Check)

| Deposits / Withdrawals | Name of Financial Institution ** | Bank Account # / DDA ** | Routing # / ABA (9 digits) | Phone Number / Contact Name |
|---|---|---|---|---|
| ☒ Deposits & Withdrawals<br>☐ Deposits Only<br>(☒ Checking or ☐ Savings) | WELLS FARGO | 1718679168 | 111900659 | 281-778-2111 / REY DIANO |
| ☐ Withdrawals Only<br>(☐ Checking or ☐ Savings) | | | | |

**AUTHORIZATION FOR AUTOMATIC FUNDS TRANSFER (ACH):** The Merchant Bank and its agents are authorized to initiate or transmit automatic debit and/or credit entries and/or check entries to the account(s) identified above and in the provided voided check(s) relating to the above account for all services contemplated under this Agreement. By signing below, authorization is hereby given to debit and credit the account listed herewithin for the purpose of making payment for Payment Services. Signatory agrees that the account listed will remain fully funded in order to satisfy ACH debits and credits for payment processing services, and as applicable, has notified its bank to allow ACH transactions from Originator ID: <u>7698484279</u>. Failed ACH debits will result in a $25 charge.

**Merchant Signatures**

Merchant agrees to pay National Discount Merchant Services (NDMS) and Bank all fees, discount rates, and other charges set forth herein or in any other document issued contemporaneously herewith, and any other charges as may be shown on the monthly statement or that arise out of the Merchant Agreement received contemporaneously with this Agreement and/or located at www.ndmscorp.com/merchant-agreement, as it may be amended from time to time.

By signing this Merchant Application either physically or electronically, I acknowledge that I have also received the Merchant Agreement, either by receiving a physical copy or by viewing the Merchant Agreement at www.ndmscorp.com/merchant-agreement. I have read the Merchant Agreement and understand it. The term of the Merchant Agreement is three years and Merchant may be subject to early termination fees equal to the greater of; (i) $295; or (ii) 80% of the product of the average net monthly fees and the number of months, including any pro rata portion of a month, then remaining in the term of the Agreement as set forth in Section 5.3 of the Merchant Agreement. I understand that the Merchant Agreement is incorporated into this Application and that both documents constitute my contract with the Bank and NDMS. I understand and agree that by viewing the Merchant Agreement online, I have acknowledged delivery of the full Merchant Agreement with the same force and effect as if I had received a physical copy of the Merchant Agreement. I understand that it is my responsibility to retain a current, complete copy of the Merchant Agreement either by retaining the physical copy or by printing it out or electronically storing the electronic version which is located at www.ndmscorp.com/merchant-agreement.

**American Express OptBlue® Program**

Merchant authorizes Bank to submit American Express sales to, and receive settlement on such sales from, American Express on behalf of Merchant. You may opt out of accepting American Express Cards at any time without directly or indirectly affecting your rights to accept any other payment products. Bank shall have the right to terminate Merchant's participation in American Express Card Acceptance immediately upon written notice to Merchant (i) if Merchant breaches any of the provisions of the American Express OPTBLUE PROGRAM Agreement or any terms of the Agreement applicable to American Express Card Acceptance, or (ii) for cause or fraudulent or other activity, or upon American Express' request. Merchant may opt-out of receiving future commercial marketing communications from American Express by contacting Bank. Merchant may continue to receive marketing communications while American Express updates its records to reflect this choice. Opting out of commercial marketing communications will not preclude Merchant from receiving important transactional or relationship messages from American Express.

**Merchant Acceptance**

By executing this Merchant Application on behalf of the merchant described above (the "Merchant"), the undersigned individual(s): (i) represent(s) and warrant(s) that all information contained in this Merchant Application Is true, correct and complete as of the date of this Merchant Application, and that such individual(s) have the requisite corporate power and authority to complete and submit this Merchant Application and make and provide the acknowledgements, authorizations and agreements set forth below, both on behalf of the Merchant and individually; (ii) acknowledge(s) that the information contained in this Merchant Application is provided for the purpose of obtaining, or maintaining a merchant account with Bank on behalf of the Merchant; (iii) authorize NDMS and Bank to investigate the credit of the Merchant and each person listed on this Merchant Application; (iv) agree, on behalf of the Merchant and in the event this Merchant Application is accepted and executed by NDMS and Bank, to all of the terms and conditions set forth in the Merchant Agreement provided with this Merchant Application and/or available electronically at www.ndmscorp.com/merchant-agreement and the Fee Schedule set forth within. **Merchant understands that this Agreement shall not take effect until Merchant has been approved by NDMS and Bank and a merchant number is issued.**

X *thomas pepe*
thomas pepe (Mar 27, 2019)
**Signature**, Principal or Corporate Officer # 1         Date

X *[signature]*
Todd Dunphy (Mar 27, 2019)
**Signature**, Principal or Corporate Officer # 2         Date

X  thomas pepe
**Print Name**

X  Todd Dunphy
**Print Name**

**Personal Guarantee**

In consideration of NDMS' and Bank's acceptance of this Agreement, the undersigned Guarantor (jointly and severally if more than one) unconditionally guarantees the performance of all obligations of Merchant to NDMS and Bank under the Agreement, and payment of all sums due thereunder, and in the event of default, hereby waives notice of default and agrees to indemnify NDMS and Bank for all funds due from Merchant pursuant to the terms of the Agreement. Guarantor waives any and all rights of subrogation, reimbursement or indemnity derived from Merchant, and further waives any and all rights or defenses arising by reason of any modification or change in the terms of the Agreement whatsoever, including, without limitation, the renewal, extension, acceleration, or other change in the time any payment or other performance thereunder is due, and / or any change in any interest or discount rate or fee thereunder. Guarantor confirms that Guarantor, collectively or individually, is a party to the Agreement, and unconditionally and specifically authorizes NDMS and Bank or their authorized agents, to debit any overdue fees, costs, chargebacks, fines, fees, penalties, expenses or obligations under the Agreement and / or any contractual relationship with NDMS and Bank from any personal checking account or other account owned or controlled by Guarantor, and further to report any default hereunder on Guarantor's personal Credit Bureau Report. Guarantor agrees to pay all costs and expenses of whatever nature, including attorneys' fees and other legal expenses, incurred by or on behalf of NDMS and Bank in connection with the enforcement of this Guaranty.

X *thomas pepe*
thomas pepe (Mar 27, 2019)
**Signature**, an Individual         Date

X *[signature]*
Todd Dunphy (Mar 27, 2019)
**Signature**, an Individual         Date

---

**Site Survey Report** (For Internal Use Only: To be completed by Account Representative)

| Building Type: ☐ Shopping Center  ☐ Office Building  ☐ Residence | Business Premises: ☐ Own  ☐ Rent | Permanent Signage: ☐ Yes  ☐ No | Inventory consistent with business? ☐ Yes  ☐ No | Business appears legitimate? ☐ Yes  ☐ No |
|---|---|---|---|---|

I hereby verify that I have inspected the business premises of the merchant, and the information stated above is correct to the best of my knowledge and belief.

Inspected By (Print Name): _____     Signature: _____     Date: _____

**NDMS / Bank Acceptance (For Internal Use Only):**     Signature/Date: _____     Signature/Date: _____

Note:

# 2b - TT Nutrition LLC Merchant App Legible

Final Audit Report 2019-03-27

| | |
|---|---|
| Created: | 2019-03-27 |
| By: | Client Relations (support@ndmscorp.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA9IySrLbBSSM0ArvNcxW5qr8e1m5jhoc_ |

## "2b - TT Nutrition LLC Merchant App Legible" History

- Document created by Client Relations (support@ndmscorp.com)
  2019-03-27 - 6:26:05 PM GMT- IP address: 162.229.164.202

- Document emailed to thomas pepe (tpepe@timtam.tech) for signature
  2019-03-27 - 6:28:41 PM GMT

- Document viewed by thomas pepe (tpepe@timtam.tech)
  2019-03-27 - 8:01:41 PM GMT- IP address: 104.13.178.203

- Document e-signed by thomas pepe (tpepe@timtam.tech)
  Signature Date: 2019-03-27 - 8:02:39 PM GMT - Time Source: server- IP address: 104.13.178.203

- Document emailed to Todd Dunphy (td@timtam.tech) for signature
  2019-03-27 - 8:02:40 PM GMT

- Document viewed by Todd Dunphy (td@timtam.tech)
  2019-03-27 - 8:03:57 PM GMT- IP address: 73.155.8.209

- Document e-signed by Todd Dunphy (td@timtam.tech)
  Signature Date: 2019-03-27 - 8:13:29 PM GMT - Time Source: server- IP address: 73.155.8.209

- Signed document emailed to Client Relations (support@ndmscorp.com), mnice@timtam.tech, Todd Dunphy (td@timtam.tech), and thomas pepe (tpepe@timtam.tech)
  2019-03-27 - 8:13:29 PM GMT

Adobe Sign

**MERCHANT AGREEMENT**

The parties to this Merchant Agreement (the "Agreement") are Chesapeake Bank ("Bank"), National Discount Merchant Services ("ISO"), and the merchant who is identified on and signed the Merchant Application ("Merchant"). Subject to the applicable Association Rules (as defined herein), Bank and ISO may divide their respective responsibilities under the Agreement in their sole discretion and either ISO or Bank may jointly or individually exercise or assert the rights or remedies provided to Bank hereunder, therefore Bank and ISO shall be jointly referred to as "Bank" hereunder. The parties agree as follows:

1. <u>Definitions</u>. For the purposes of this Agreement, the Application, and any Schedules referred to herein, the following definitions apply unless the context otherwise requires:

    1.1. "Address Verification" shall mean a service which allows Merchant to verify Cardholder's billing address with Issuer.

    1.2. "Application" shall mean the merchant application that has been filled out and submitted to Bank by Merchant.

    1.3. "Association(s)" shall mean VISA, Inc. and MasterCard International, Inc., Discover, American Express

    1.4. "Authorization" shall mean an affirmative response by or on behalf of an Issuer, to Merchant's request to effect a Transaction, that a Transaction is within the Cardholder's available credit limit and that the Cardholder has not reported the Card lost or stolen. All Transactions require Authorization.

    1.5. "Business Day" shall mean any day other than:
        i.   Saturday or Sunday;
        ii.  A day on which banking institutions in Virginia are authorized by law or executive order to be closed (and on which Bank is in fact closed); or
        iii. A day on which the Federal Reserve Bank is closed.

    1.6. "Card(s)" shall mean either a Visa or MasterCard credit card or debit card.

    1.7. "Cardholder" shall mean a person authorized to use a Card.

    1.8. "Card-Not-Present" shall mean mail order, telephone order, e-commerce (Internet) order, or other transactions that are not Card-Present Transactions.

    1.9. "Card-Present Transaction" shall mean a Transaction in which the Card is swiped through a terminal, register or other device, capturing the Card information encoded on the magnetic strip.

    1.10. "Chargeback" shall mean a Transaction that Bank returns to Merchant pursuant to this Agreement.

    1.11. "CVV" shall mean a service which allows Merchant to verify Cardholder's possession of Card through the identification of unique digits on Card.

    1.12. "Forced Sale" shall mean a sales Transaction processed without an approved electronic authorization number being obtained for the full amount of the sales Transaction at the time the Transaction is processed.

    1.13. "Issuer" shall mean an Association member that issued a Card to a Cardholder.

    1.14. "IVR" shall mean interactive voice response unit used for an Authorization.

    1.15. "Merchant Servicer" shall mean non-members other than the Merchant that receive, pass, or store transaction data on their internal systems on behalf of the Merchant. This includes third party servicers, Web hosting companies, shopping cart providers, and media back-up companies. Merchant Servicers must be registered with Visa by Bank.

    1.16. "Merchant Statement" shall mean an itemized daily and monthly statement of all charges and credits to the Operating Account.

    1.17. "Operating Account" shall mean a demand deposit account at Bank, or other approved financial institution through which fees, charges and credits due in accordance with this Agreement may be processed.

    1.18. "Pre-Authorized Recurring Order Transactions" shall mean Transactions which have been pre-authorized by the Cardholder and for which the goods or services are to be delivered or performed in the future by Merchant without having to obtain approval from the Cardholder each time.

    1.19. "Reserve Account" shall mean an account at Bank for all future liabilities of Merchant to Bank which may arise out of this Agreement.

    1.20. "Services" shall mean the transaction processing services provided by Bank under this Agreement.

    1.21. "Transaction" shall mean the acceptance of a Card or information embossed on the Card for payment for goods sold and/or leased or services provided to Cardholders by Merchant and receipt of payment from Bank, whether the transaction is approved, declined, or processed as a Forced Sale. "Transaction" also includes credits and voids.

2. <u>Merchant Obligations and Requirements</u>.

    2.1. <u>Merchant Card Processing</u>. Merchant is in the business of selling and/or leasing goods and/or providing services to its customers as described in the Application. Merchant has requested and Bank has agreed to permit Merchant's participation in the card processing programs and services. Merchant agrees that it will not materially change its business or the method in which it markets or sells its goods and services without notifying Bank. Without the prior written consent of Bank, Merchant is not authorized to process Transactions for payment for any other type of goods or services other than as set forth in the Application. Bank reserves the right to establish certain limits on volume of daily, weekly, and monthly transactions and dollar limits per Transaction which Merchant may process.

    2.2. <u>Merchant Operating Account</u>. Prior to accepting any Cards, Merchant shall establish the Operating Account at Bank or a financial institution of Merchant's choice which is approved by Bank. Merchant authorizes Bank to debit all fees and charges from the Operating Account, whether maintained at Bank or another financial institution, daily, monthly or at times deemed appropriate by Bank through the ACH Banking Network or by a manual debit of the account. Merchant shall maintain this Operating Account throughout the term of this Agreement and any extensions or renewals thereof. Merchant shall, at all times, maintain sufficient funds in this Operating Account to ensure that all fees, charges and costs provided for under this Agreement are paid, including any reserve requirements set by Bank in accordance with Section 2.3 below. Merchant agrees to deposit funds into the Operating Account as required in order to ensure that sufficient funds are maintained in the Operating Account. Merchant

authorizes Bank to make deposits to, or withdrawals from, the Operating Account. Only the person(s) signing this Agreement on behalf of Merchant shall be authorized to make any changes to the Operating Account. Any changes shall be in writing and must be approved in writing by Bank. If required by Bank or any other financial institution where the Operating Account is maintained, Merchant agrees to sign any other additional documents to authorize ACH transactions. Merchant agrees to be bound by the operating rules of the National Automated Clearing House Association ("NACHA"). Merchant waives any claims for loss or damage arising out of any charges or debits to the Operating Account against any other designated financial institution where the account is maintained. Merchant hereby grants a security interest and lien upon the Operating Account and/or any substitute account now and in the future and all proceeds thereof to Bank to secure all fees, costs and charges due in accordance with this Agreement.

2.3. Reserve Account. Upon execution of this Agreement, or at any time during the term of this Agreement, Bank may establish a Reserve Account for all future indebtedness of Merchant to Bank which may arise out of this Agreement including, but not limited to, Chargebacks and fees on Transactions and penalties which may be imposed by any Card Issuer for failure to comply with Card Issuer's requirements in accordance with Section 4.1 below. Bank may fund the Reserve Account by deduction from payments due Merchant, a charge against Merchant's Operating Account, or against any of Merchant's accounts at Bank or the financial institution at which Merchant maintains its Operating Account. The amount required to be maintained in the Reserve Account and the terms and conditions for maintaining the account shall be established by Bank, in its reasonable discretion. Upon termination of this Agreement, Bank may require an additional reserve to cover possible indebtedness to Bank for Transactions initiated prior to termination. This Reserve Account will be maintained for a minimum of six months from the termination date or until such time as Bank determines that the release of the funds to Merchant is prudent, in the best interest of Bank, commercially reasonable and Merchant's account with Bank is fully resolved. Upon expiration of this period, any balance remaining in the Reserve Account will be paid to Merchant. Bank will inform Merchant in writing of any charges debited to the Reserve Account during this period. Merchant hereby grants a security interest in the Reserve Account and/or any substitute account now and in the future and all proceeds thereof to Bank to secure all fees, costs and charges due in accordance with this Agreement. In addition to any regularly required reserve, Bank may, at its sole discretion, direct processing funds to the Reserve Account and withhold payment to Merchant at any time that Bank becomes concerned about any aspect of Merchant's business including, but not limited to concerns about the operation, management and/or financial performance of Merchant and/or concerns about the goods or services being offered for sale or lease by Merchant. Bank may, at its sole discretion at any time, require, as a condition of this Agreement or the continuance of this Agreement, that Merchant provide satisfactory security to Bank to secure all payments due to Bank under this Agreement, including, but not limited to, requiring a surety bond in a form and amount satisfactory to Bank.

2.4. Adjustments and Returns. Merchant will maintain a fair exchange and return policy and make adjustments with respect to goods and services sold and/or leased to its customers whenever appropriate. In the event that goods are returned, or any services are terminated or cancelled, or any price is adjusted on a Transaction, Merchant will prepare and transmit a credit or return Transaction, either electronically or by paper, for the amount of the adjustment as a deduction from the total amount of sales drafts transmitted that day. In the event the amount of credit or return Transactions exceeded the amount of sales draft Transactions, Bank shall charge Merchant's Operating Account for the excess. Merchant shall make no cash refunds on Transactions and shall handle all credit adjustments as provided in this Section. Sales drafts for any Transaction for which no refund or return will be given must be conspicuously marked as a "final sale" and "no returns" on the customer's copy of the sales draft at the time of the Transaction. If Merchant has a no-cash refund policy, in store credit only, that policy must appear on the sales draft. Upon credits or returns issued, Bank will not refund the discount or any other association fees or assessments previously applied on any corresponding charges. All Merchants must follow Visa and MasterCard reservation/no-show policy. All Merchants must notify Cardholders in writing of this policy on all advance reservations. The Cardholder must be notified of the exact number of days required for reservation deposit refunds. A Merchant not following Visa, MasterCard and Discover reservation/no-show policies may receive a charge back to its Operating Account.

2.5. Customer Complaints. Merchant shall respond promptly to inquiries from Cardholders and shall resolve any disputes amicably. Bank reserves the right to charge Merchant reasonable fees and reimbursement, in addition to any applicable Association fees or charges, on account of excessive Cardholder inquiries, refunds or Chargebacks. Merchant agrees to maintain the following information in writing with respect to each claim or defense asserted by a Cardholder for which Merchant has received notice:
    i. The Cardholder's name;
    ii. A unique confirmation number (transaction sequence number, or other identifier) that the Merchant can use to reference the transaction in subsequent communications with Bank;
    iii. The date and time the Cardholder asserted the claim or defense;
    iv. The nature of the claim or defense; and
    v. The action which Merchant took in an attempt to resolve the dispute.
Upon request, Merchant shall furnish Bank with this information in writing within 10 days.

2.6. Auditing and Credit Investigation. Merchant authorizes Bank or its agents to investigate the background and personal credit history of any of the principals and employees associated with Merchant's business from time to time, and to obtain a business report on Merchant's business from Dunn & Bradstreet or any company providing a similar service. Bank may terminate this Agreement if the information received in any investigation is unsatisfactory in Bank's reasonable discretion. Bank may also audit from time to time, Merchant's compliance with the terms of this Agreement. Merchant shall provide all information requested by Bank necessary to complete the audit. Upon Bank's request, Merchant shall provide financial statements for Merchant and personal financial statements for all guarantors.

2.7. Exclusivity. Merchant shall submit all Card Transactions during the term hereof solely to Bank for processing. If Merchant fails to comply with this provision, Merchant agrees to pay ISO, a liquidated damages sum within 10 days of the date of non-compliance. The amount shall equal the greater of:

    i.    $795 before month 13, $295 before month 25; or
    ii.    80% of the product of:
        1.    The average net monthly fees; and
        2.    The number of months, including any pro rata portion of a month, then remaining in the term of the Agreement.

Merchant agrees that the damages suffered as a result of such non-compliance would be extremely difficult to calculate with precision. For that reason, the parties hereto agree that the liquidated damages should be computed as set forth above. Any exceptions to this

exclusive arrangement must be approved by Bank in advance and in writing.

2.8. <u>Retention of Sales Information</u>. Merchant shall store all sales drafts and Transaction records in a limited access area for at least one year after the date of sales. Merchant shall retain all original sales drafts and Transaction records for at least three years. Merchant is responsible for maintaining complete backup records of all information relating to its customers' orders, inquiries, purchases, sales and any other customer information.

2.9. <u>Confidentiality</u>. Merchant shall treat all information received in connection with this Agreement, including but not limited to this Agreement, cardholder account or other personal information, and other transactional information as confidential. Merchant shall prevent the disclosure of this information except for necessary disclosures to Merchant Servicers, to affected Cardholders, to Bank and to Issuers. See Sections 4.3 and 8.4 below for further requirements regarding the protection of cardholder data.

2.10. <u>Third Party Servicers.</u> Merchant understands and agrees that Merchant shall be responsible for any Merchant Servicers or other third party service providers with which Merchant has contracted to provide services related to Merchant's processing of Transactions hereunder (collectively "Third Party Servicers") and Merchant shall ensure that such Third Party Servicers comply with the requirements of Bank, the Associations and any applicable Rules, laws and regulations. Merchant shall indemnify and hold Bank harmless from the actions or inactions of any Third Party Servicer.

3. <u>Bank Obligations and Requirements</u>.

3.1. <u>Bank to Provide Services to Merchant</u>. Bank agrees to sponsor Merchant's acceptance of Cards for Transactions. Bank agrees to provide Merchant with the Services indicated on the Application, as amended from time to time by Bank, during the term of this Agreement, subject to the terms and conditions of this Agreement.

3.2. <u>Reconciliation of Transactions</u>.
   i. <u>Electronically Transmitted Transactions</u>. Bank shall deliver payment to Merchant by a credit to the Operating Account equal to the reconciled summary of Merchant's total summary Transactions since the previous credit. This credit will be net of following charges:
   1. The sum of all Cardholder charges denied, refused or charged back;
   2. All refunds processed on account of Cardholders during said time period;
   3. All taxes, penalties, charges and other items incurred by Bank that are reimbursable pursuant to this Agreement; and
   4. Fees, including but not limited to an amount equal to a specified percentage of the total cash price of each draft ("Merchant Discount Rate"), discount rate minimum (monthly minimum), a specified amount per Transaction ("Transaction Fee") and additional fees such as a monthly terminal fee, monthly statement fee, installation fees and any other fees identified on the Application.
   ii. <u>Provisional Credit</u>. Any credits to the Operating Account are provisional only and subject to revocation by Bank until such time that the Transaction is final and no longer subject to chargeback by the Issuer, Cardholder or Associations.

3.3. <u>Merchant Statement</u>. Bank shall make available a Merchant Statement or similar information on no less than a monthly basis. All information appearing on the Merchant Statement shall be deemed accurate and affirmed by Merchant unless Merchant objects by written notice specifying the particular item in dispute within 60 days of the date of the Merchant Statement. Delivery of the Merchant Statement may be in written or electronic form.

3.4. <u>Chargebacks</u>. Merchant understands and agrees that Bank is in no way financially responsible for chargebacks. Bank shall be authorized to charge back to Merchant any Transactions as specified throughout this Agreement and for reasons including, but not limited to, the following:
1. No specific prior authorization for the Transaction was obtained;
2. The Transaction was based on a pre-authorization form and the Card on which the Authorization was based has been cancelled and Merchant was so notified prior to the Transaction;
3. The Card giving rise to the Transaction was cancelled and prior to, or at the time of, the Transaction, Merchant received notice of the cancellation through the electronic terminal, in writing or otherwise;
4. The Card expired prior to the date of the Transaction or the date of Transaction was prior to the validation date, if any, indicated on the Card;
5. The information required in Sections 8.1 (Documenting Transactions) and 8.2iii(Card-Not-Present Transactions) was not submitted to Bank;
6. Bank or Issuer has received a complaint from or on behalf of a Cardholder stating that there is an unresolved dispute or defense to a charge (whether or not valid) between Merchant and Cardholder;
7. The Cardholder makes a written complaint to Bank or Issuer that the Cardholder did not make or authorize the Transaction;
8. A setoff or counterclaim of any kind exists in favor of any Cardholder against Merchant that may be asserted in defense of an action to enforce payment against the Cardholder in a Transaction;
9. The Transaction was made at or by a Merchant other than Merchant named in this Agreement;
10. The Transaction otherwise violates the terms of this Agreement or any other Association or Issuer bylaw, rule, regulation, policy or guideline;
11. A Transaction is charged back by an Issuer; or
12. Any representation or warranty made by Merchant in connection with the Transaction is false or inaccurate in any respect.

In the event a Transaction is charged back or eligible for charge back as set forth above, Bank shall not be obligated to accept such Transaction for credit to the Operating Account. If Bank has credited the Operating Account or Reserve Account for such a Transaction, Bank may return the Transaction to the Merchant, and Bank shall recover the amount of the Transaction from either aforementioned account. Merchant agrees that Bank, without prior notice to Merchant, may:
1. Charge the amount of the Transaction to the Operating Account or Reserve Account;
2. Recoup the amount of the Transaction by adjustment of the credits due to Merchant; or
3. Set off the amount of the Transaction against any account or property Bank holds for or on behalf of Merchant.

4. <u>Compliance.</u>

4.1. <u>Associations' and Issuers' Requirements</u>. Merchant and Bank shall comply with all bylaws, rules, regulations, policies and guidelines of the Associations and any Issuer whose Cards are used to process Transactions in accordance with this Agreement (collectively the "Rules"). Summaries of the Visa and MasterCard Association Rules are available for merchants at www.visa.com and www.mastercard.com. The parties agree that this Agreement shall be governed by the Association Rules and that any portion of this Agreement which conflicts with the Association Rules (as they may be amended from time to time) shall be superseded thereby.

4.2. Use of Marks. Merchant will display prominently at its place of business Card emblems and other promotional material and literature provided by Bank. Subject to the prior written consent of Bank and upon such conditions as authorized by Bank, Merchant may use Card service marks or design marks in its own advertisement and promotional materials.

4.3. Payment Card Industry Security Requirements. Merchant and all Merchant Servicers that have access to cardholder data will maintain and demonstrate compliance with the applicable standards of the Payment Card Industry ("PCI") Security Standards Council, as updated or amended by the PCI from time to time. Merchant will notify Bank of any Merchant Servicer that has access to cardholder data.

4.4. Cardholder Data Protection. Merchant understands and agrees that it is responsible for ensuring that it securely transmits and stores Cardholder data.

   i.   Visa, MasterCard, Discover, American Express and other card issuers have implemented standards and programs to ensure the protection of Cardholder data and Merchant agrees to comply with all such programs, including but not limited to, (i) the PCI Data Security Standard ("PCI-DSS"), (ii) the Visa Cardholder Information Security Program ("CISP"), and (iii) the MasterCard Site Data Protection Program ("SDP"). Information about the programs and specific requirements can be obtained at www.visa.com/cisp and www.pcisecuritystandards.org. A copy of the American Express Data Security Requirements ("DSR") can be obtained online at www.americanexpress.com/dsr. The following list describes some of the current PCI-DSS, CISP and SDP requirements however this is not intended to be a complete list and Merchant remains solely responsible for understanding and complying in full with all of the applicable PCI-DSS, CISP and SDP requirements:

   1. Install and maintain a firewall configuration to protect data
   2. Do not use vendor-supplied defaults for system passwords and other security parameters
   3. Protect stored data
   4. Encrypt transmission of cardholder data and sensitive information across public networks
   5. Use and regularly update anti-virus software
   6. Develop and maintain secure systems and applications
   7. Restrict access to data by business need-to-know
   8. Assign a unique ID to each person with computer access
   9. Restrict physical access to cardholder data
   10. Track and monitor all access to network resources and cardholder data
   11. Regularly test security systems and processes
   12. Maintain a policy that addresses information security

   ii.   In the event of an actual or suspected security intrusion, Merchant agrees to notify Bank immediately and to fully cooperate with a third party approved PCI assessor and/or representative to conduct a thorough security review and validate compliance with the PCI-DSS for protecting Cardholder data;
   iii.   Merchant, if undergoing a forensic investigation, must fully cooperate with the investigation until completed;
   iv.   Merchant is responsible for the security of Cardholder data in its possession;
   v.   Bank, Merchant and each payment card brand have ownership of Cardholder data and Merchant may use such data ONLY for assisting these parties in the completion of Transactions, supporting a loyalty program, providing fraud control services, or for other uses specifically required by law;
   vi.   In the event this Agreement is terminated by any of the parties, each party agrees to continue to treat account holder data as confidential;
   vii.   Immediately notify Bank, of the use of a Merchant Servicer; and
   viii.   Ensure all Merchant Servicers implement and maintain all of the security requirements, as specified in the PCI program.

4.5. Compliance with Applicable Law. Merchant represents and warrants that it has obtained all necessary regulatory approvals, certificates and licenses to provide any services it intends to offer and that it is in compliance with the applicable rules and regulations of the Federal Trade Commission and the Federal Communications Commission and shall comply with all present and future federal, state and local laws and regulations pertaining to Transactions, including, without limitation, the Federal Fair Credit Reporting Act, the Federal Truth-in-Lending Act, the Electronic Fund Transfers Act, the Federal Equal Credit Opportunity Act, as amended, and the Telephone Disclosure and Dispute Resolution Act, as applicable.

4.6. Web Site Requirements for E-Commerce Merchants. A web site operated by the Merchant that accepts Card Transactions must contain all of the following information:
   i.   Association approved Brand Logos
   ii.   Complete description of the services offered;
   iii.   Return merchandise and refund policy; which includes the communication of the return policy during the order process and the requirement that the cardholder must be allowed to select a "click to accept" option of other affirmative button to acknowledge the policy;
   iv.   Transaction currency;
   v.   Export or legal restrictions;
   vi.   Delivery policy;
   vii.   Consumer data privacy policy;
   viii.   The security method offered for transmission of payment data such as Secure Sockets Layer or 3-D Secure; and
   ix.   Address of the Merchant outlet's permanent establishment, including the Merchant outlet country;
   x.   Any other terms and conditions applicable to the purchase.
The above information must be provided either (i) on the same screen view as the checkout screen used to present the total purchase amount; or (ii) within the sequence of web pages the Cardholder accesses during the checkout process.

4.7. Processing Requirements.
   i.   Merchant must not knowingly submit any Transaction that is illegal, or that Merchant should have known was illegal.
   ii.   Associations have the right to limit or terminate this Agreement.
   iii.   Merchant is prohibited from depositing a Transaction that does not result from an act between the Cardholder and the Merchant.
   iv.   Merchant must not accept cardholder payments for previous Visa Card or Visa Electron Card charges incurred at the merchant location.
   v.   Merchant must not enter into Interchange any transaction receipt for a transaction that was previously charged back irrespective of cardholder approval. The merchant may pursue payment from the customer outside the Visa system.
   vi.   Merchant must not request or use an account number for any purpose other than as payment for its goods or services.

vii. Merchant must not enter into Interchange a transaction that represents collection of a dishonored check.

viii. Merchant must not deposit a credit transaction without a preceding debit.

5. <u>Term</u>.

5.1. <u>Term</u>. This Agreement shall become effective when signed by all parties and, unless sooner terminated in accordance with this Agreement, shall remain in effect for a term of three years. This Agreement shall renew automatically for successive terms of three years each, unless any party provides written notice of termination to the other parties at least 90 days prior to the end of the then current term. All existing obligations, warranties, indemnities and agreements with respect to Transactions entered into before such termination shall remain in full force and effect and Merchant shall remain liable for all obligations to Cardholders and Bank incurred while this Agreement was in effect.

5.2. <u>Termination of Agreement by Bank</u>. Bank may terminate this Agreement at any time effective upon 30 days prior written notice to Merchant.

In order to protect the Associations and the Bank, Bank may terminate this Agreement immediately in the following circumstances:

i. Any information obtained by Bank through a credit investigation is unsatisfactory to Bank;

ii. Any criminal act or act of fraud or dishonesty is committed by Merchant, its employees, licensees, successors, agents, and/or assigns;

iii. Chargebacks in excess of Association monitoring guidelines;

iv. Breach of this Agreement by Merchant;

v. Bankruptcy, insolvency or receivership proceedings are started by or against Merchant or any guarantor;

vi. Merchant fails to pay all amounts due to Bank in accordance with this Agreement within 30 days;

vii. Merchant fails to maintain sufficient funds in Merchant's Operating Account and/or Reserve Account to cover all amounts owed by Merchant under this Agreement;

viii. Merchant's percentage of error Transactions or retrieval requests is excessive in the opinion of Bank;

ix. There is a material adverse change in the financial condition of Merchant in the determination of Bank;

x. Merchant exceeds the volume limitations established by Bank as part of this Agreement;

xi. Merchant changes the types of goods or services provided to its customers without the prior consent of Bank;

xii. There is a change in the volume, character or method of Merchant's transactions or chargebacks that is not satisfactory to Bank;

xiii. There is a change in structure or ownership of Merchant by any means or manner, including, but not limited to, a change in stock ownership, member interest, partnership interest, a change by merger or reorganization or a change of name;

xiv. Merchant appears on the Association Terminated Merchant File.

Bank may selectively terminate one or more of Merchant's approved locations without terminating this Agreement. In the event of termination, all obligations of Merchant incurred or existing under this Agreement prior to termination shall survive the termination. Merchant's obligations with respect to any Transaction shall be deemed incurred and existing on the transaction date of the Transaction.

5.3. <u>Termination of Agreement by Merchant</u>. Merchant may terminate this Agreement upon at least 30 days prior written notice to the Bank if Bank breaches a material provision of this Agreement and fails to cure such breach within such 30-day period. Merchant may also terminate this Agreement upon 30 days prior written notice to Bank if Bank amends the Agreement as provided in Section 9.14ii below, to increase any non-pass through rate or charge by a total of more than 5% within any one calendar year (a "Rate Increase Termination"). Merchant must provide notice of a Rate Increase Termination within 30 days of receiving notice of the related rate increase. In the event that this Agreement is terminated by Merchant without cause, or as a result of account dormancy as determined by Bank, Merchant will be charged an early termination fee equal to the greater of; (i) $295; or (ii) 80% of the product of the average net monthly fees and the number of months, including any pro rata portion of a month, then remaining in the term of the Agreement. Merchant agrees that the damages suffered as a result of early termination of the Agreement would be extremely difficult to calculate with precision. For that reason, the parties hereto agree that the liquidated damages should be computed as set forth above.

5.4. <u>Deconversion Fees</u>. If this Agreement is terminated and Merchant requires assistance from Bank with moving to a new processor, Merchant agrees to pay Bank for the fees associated with such deconversion services as provided by Bank.

6. <u>Merchant Billing.</u>

6.1. <u>Fees</u>. Merchant agrees to pay all fees, including, but not limited to monthly service fees, Chargebacks and set-up fees as specified on and in accordance with the Application and this Agreement as may be amended from time to time. Merchant also agrees to pay Bank the amount of any fees, charges or penalties assessed against Bank by any Association or Issuer for Merchant's violation of the by-laws, rules, regulations, guidelines, policy statements or threshold requirements of such parties.

6.2. <u>Late Fees</u>. If Merchant does not pay sums due within 30 days of notice by Bank, Bank will charge and Merchant agrees to pay, a late fee of 1.5% per month on the balance outstanding, or the highest amount allowed by law.

6.3. <u>Collection Charges.</u> Should Bank take any action against Merchant to collect sums due hereunder, Merchant agrees to pay all costs associated with such collection efforts, including but not limited to reasonable attorney's fees.

6.4. <u>Excessive Chargeback Fees</u> Merchant agrees that additional fees per chargeback and compliance, if above reasonable chargeback levels, as determined by Bank in its sole discretion, will apply.

6.5. <u>Taxes</u>. Merchant agrees to pay all federal, state, and local state, use, property and excise taxes which may be assessed in connection with the services and related products provided under this Agreement.

7. <u>Liability and Indemnification</u>.

7.1. <u>Limitation of Liability</u>. Bank shall not be liable to Merchant or Merchant's customers or any other person for any of the following:

i. Any loss or liability resulting from the denial of credit to any person or Merchant's retention of any Card or any attempt to do so;

ii. Any loss caused by a Transaction downgrade resulting from defective or faulty software or equipment;

iii. Any loss or liability resulting from the product or service of a third party.

        iv.	Bank has the right to place the merchant on the Terminated Merchant File if the merchant has been terminated for cause and Merchant agrees to indemnify and hold Bank harmless for taking such action.

    7.2.	<u>Limitation on Damages</u>. BANK SHALL NOT BE LIABLE FOR ANY PUNITIVE, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES TO MERCHANT OR TO ANY THIRD PARTY IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE SERVICES TO BE PERFORMED BY BANK PURSUANT TO THIS AGREEMENT. In no case shall Merchant be entitled to recover damages from Bank which exceed the fees retained by Bank pursuant to this Agreement during the one month period immediately prior to the event giving rise to the claim for damages.

    7.3.	<u>Indemnification</u>. Merchant agrees to indemnify and hold Bank harmless from any and all losses, claims, damages, liabilities and expenses, including reasonable attorneys' fees and costs (whether or not an attorney is an employee of or affiliates, Bank or Bank's affiliates) arising out of any of the following:

        i.	Merchant's misrepresentation or breach of this Agreement;
        ii.	Any act or omission of Merchant;
        iii.	The act or omission of any Third Party Servicer;
        iv.	Merchant's failure to comply with any bylaw, rule, regulation, guideline or policy of any Association or Issuer;
        v.	Merchant's failure to comply with any applicable law, rule or regulation;
        vi.	Any Cardholder dispute concerning the quality, condition or delivery of any Merchant merchandise or the quality of performance of any Merchant service;
        vii.	The fraud or dishonesty of Merchant or Merchant's employees, licensees, successors, agents and/or assigns;
        viii.	Merchant's selection of an Internet service provider or other telecommunication services provider;
        ix.	Card-Not-Present Transactions, unauthorized Transactions or prohibited Transactions.

MERCHANT ACKNOWLEDGES THAT BANK HAS NOT PROVIDED ANY WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE WITH RESPECT TO THE SERVICES IT PROVIDES HEREIN. SHOULD THERE BE ERRORS, OMISSIONS, INTERRUPTIONS OR DELAYS RESULTING FROM BANK'S PERFORMANCE OR FAILURE TO PERFORM OF ANY KIND, BANK'S LIABILITY SHALL BE LIMITED TO CORRECTING SUCH ERRORS, IF COMMERCIALLY REASONABLE.

8.	<u>Collection and Use of Transaction Information</u>.

    8.1.	<u>Documenting Transactions</u>. Merchant shall submit the following information to Bank in connection with Transaction processing:

        i.	The DBA name of Merchant, name of Merchant and Merchant's address;
        ii.	Merchant customer service telephone number;
        iii.	Merchant Internet address;
        iv.	Merchant Number assigned by Bank;
        v.	The Card account number, validation date and/or expiration date of the Card, if one appears on the Card;
        vi.	Such additional information as may be required by Bank and/or the Associations, from time to time.

Merchant shall not submit a Transaction to Bank (electronically or otherwise) until Merchant has performed its obligations to the Cardholder in connection with the Transaction or obtained Cardholder's consent for a Pre-Authorized Recurring Order Transaction. Merchant must not transmit a Transaction to Bank that Merchant knows or should have known to be fraudulent or not authorized by the Cardholder. Merchant is responsible for its employees' actions. Merchant may transmit a Transaction which effects a prepayment of services or full prepayment of custom-ordered merchandise, manufactured to a Cardholder's specifications, if Merchant advises Cardholder of the immediate billing at the time of the Transaction and within time limits established by the Associations.

    8.2.	<u>Authorization for Transactions</u>. Merchant shall obtain Authorization of Transactions as follows:

        i.	<u>Electronically Transmitted Transaction</u>. Merchant shall submit each Transaction for Authorization to Bank's designated authorization center. Bank's designated authorization center shall respond with the Issuer's authorize or decline to a Transaction transmitted for Authorization and shall capture and process for Merchant the information relating to the Transaction.
        ii.	<u>Card-Present Transactions</u>. The following additional requirement applies to Card-Present Transactions: If a terminal or software application is inoperable at the time of an Authorization request, the Transaction may be manually authorized. In that case, the Transaction shall be entered as a Forced Sale, provided the approval number is also entered, and Merchant shall be subject to an additional IVR authorization fee as outlined in the Application.
        <u>Card-Not-Present Transactions</u>. The following additional requirements apply to Card-Not-Present Transactions:

        1.	All Card-Not-Present Transactions are at Merchant's risk. As to each, Card-Not-Present Transactions Merchant warrants to Bank that the person whose name is submitted to Bank as Cardholder either made or authorized another to make the purchase. Upon breach of this warranty, Bank may charge back the Transaction to Merchant. If Bank charges back the Transaction to Merchant, Merchant shall pay Bank the amount of the Transaction, a Chargeback fee, plus any Association fine or assessment. Bank may charge the Transaction to the Operating Account or Reserve Account without prior notice to Merchant;
        2.	All Card-Not-Present Transactions must be electronically authorized and, in addition to the information required in Section 8.1 (Documenting Transactions), also shall indicate: an authorization code, if required; customer address and address verification; CVV (card verification value) and in lieu of Cardholder's signature, a notation of (a) mail order, (b) telephone order, (c) e-commerce order, or (d) pre-authorized order, on the signature line;
        3.	If Merchant accepts a Pre-Authorized Recurring Order Transaction, the Cardholder shall execute and deliver to Merchant a written request for this pre-authorization. This written request shall be maintained by Merchant and made available upon request to Bank. All annual billings must be reaffirmed at least once a year. Merchant shall not deliver goods or perform services covered by a Pre-Authorized Recurring Order Transaction after receiving notification from the Cardholder that the pre-authorization is cancelled or from Bank that the Card covering the Pre-Authorized Recurring Order Transaction is not to be honored; and
        4.	Merchant shall verify Cardholder's address from the Association network. For telephone or mail order sales, Merchant shall transmit a ticket/invoice number and shall perform Address Verification, CVV and only accept as approved those Transactions receiving at least a partial match or system unavailable response.

    8.3.	<u>Prohibited Transactions</u>. Merchant shall not do any of the following with respect to any Transaction:

        i.	Impose a surcharge on a Cardholder who elects to use a Card in lieu of payment by cash, check or other mode of payment;
        ii.	Charge a Cardholder more than the amount the Cardholder would pay if payment were made by cash or check;

  iii. Obtain multiple authorizations for amounts less than the total credit sale amount;

  iv. Obtain authorization for purposes of setting aside Cardholder's credit line for use in future sales;

  v. Make any special charge to or extract any special agreement or security from any Cardholder in connection with any Transaction;

  vi. Transmit or accept for payment any Transaction which was not originated directly between Merchant and a Cardholder for the sale or lease of goods or the performance of services of the type indicated in Merchant's application for card processing services initially submitted to and approved by Bank;

  vii. Honor or accept a Card as payment for any legal services or expenses arising out of or related to (1) the defense of any crime other than a traffic violation; (2) any domestic relations matter where such services or expenses are furnished to a person whose name is not embossed on a Card; or (3) any bankruptcy, insolvency, compromise, composition or other process affecting Cardholder's creditors;

  viii. Use Merchant's own Card, or one to which Merchant has access, to process a Transaction for the purpose of obtaining credit for Merchant's own benefit;

  ix. Redeposit a previously charged Transaction, regardless of whether Cardholder consents;

  x. Initiate a Transaction credit without a balance in the Operating Account equal to the credit;

  xi. Use a Merchant Servicer's payment processing platform and any data received thereon for any other purpose except for determining whether or not Merchant should accept Cards in connection with a current sale or lease of goods or services;

  xii. Use a Merchant Servicer's payment processing platform and data received thereon for credit inquiry purposes or any other purpose not authorized by this Agreement;

  xiii. Draw or convey any inference concerning a person's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living when any Card is processed as non-accepted;

  xiv. Disclose any information obtained through the Merchant Servicer's payment processing platform to any person except for necessary disclosures to affected Cardholders, Bank and/or the Issuer;

  xv. Add any tax to Transactions unless applicable law expressly requires that Merchant collect such a tax. Any tax, if allowed, must be included in the Transaction amount and not collected separately;

  xvi. Disburse funds in the form of traveler's checks, if the sole purpose is to allow the Cardholder to make a cash purchase of goods or services from Merchant;

  xvii. Disburse funds in the form of cash, except:

   1. If Merchant is approved by Bank for cashback Transactions and in such Transaction the cashback portion of the Transaction is the only portion disbursed as cash; or

   2. Merchant is dispensing funds in the form of traveler's checks, Visa TravelMoney Cards or foreign currency. In this case, the Transaction amount is limited to the value of said form of dispensation plus any fee or commission charged to the Merchant.

  xviii. Accept a Card to collect or refinance an existing debt;

  xix. Issue a Transaction credit for return goods or services acquired in a cash transaction;

  xx. Make any cash refund to a Cardholder who has made a purchase with a Card. All Transaction credits will be issued to the same Card account number as the sale;

  xxi. Require a Cardholder to complete a postcard or similar device that includes the Card's account number, Card expiration date, signature or any other Card account data in plain view when mailed; or

  xxii. Accept Visa Card or Visa Electron Card for the purchase of scrip.

  8.4. <u>Disclosure and Storage of Transaction Information</u>.

  i. A Merchant must not disclose a Card account number, personal information, or other Transaction information to third parties other than to Merchant Servicers or Bank for the sole purpose of:

   1. Assisting the Merchant in completing the transaction; or

   2. As specifically required by law.

   3. Merchant may only disclose Transaction information to approved third parties for the sole purpose of:

    a. Supporting a loyalty program; or
    b. Providing fraud control services.

  ii. A Merchant must store all material containing Card account numbers or imprints (such as transaction receipts, car rental agreements and carbons) in an area limited to selected personnel and:

   1. Render all data unreadable prior to discarding;

   2. The Merchant must not retain or store full contents of any track on the magnetic stripe subsequent to a Transaction;

   3. The Merchant must not retain or store CVV data subsequent to Authorization of a Transaction;

   4. The Merchant must not request the CVV data on any paper form.

  iii. The sale or disclosure of databases containing cardholder account numbers, personal information, or other Card transaction information to third parties is prohibited.

  8.5. <u>Use and Disclosure of BIN Information</u>. A Merchant that receives BIN information from Bank must not use such information for any reason other than to identify Visa debit category products at the point of sale, unless authorized by Visa.

9. American Express

  The following terms and conditions apply to Merchant's participation in the American Express OptBlue® Program ("American Express Card Acceptance"):

  9.1. The American Express Merchant Operating Guide ("MOG") sets forth the policies and procedures governing Merchant's acceptance of the American Express Card. It is a part of, and is hereby incorporated by reference into, the Agreement. Merchant agrees to be bound by and accept all provisions in the MOG (as changed from time to time) as if fully set out in the Agreement and as a condition of Merchant's agreement to accept the Card. Merchants may obtain the latest version of the MOG by visiting www.americanexpress.com/merchantopguide or by contacting Bank.

  9.2. Merchant acknowledges that it may be converted from American Express Card Acceptance to a direct relationship with American Express if and when its sales volumes exceed the eligibility thresholds for American Express Card Acceptance. If this occurs, upon such conversion, (i) Merchant will be bound by American Express' then-current Card Acceptance Agreement; and (ii) American Express will set pricing and other fees payable by Merchant.

  9.3. Merchant shall not assign to any third party any payments due to it under American Express Card Acceptance, and all indebtedness arising from sales will be for bona fide sales of goods and services (or both) at its business locations and free of liens, claims, and encumbrances other than ordinary sales taxes;

provided, however, that the Merchant may sell and assign future sales receivables to Bank, its affiliated entities and/or any other cash advance funding source that partners with Bank or its affiliated entities, without consent of American Express. Notwithstanding the foregoing, Bank prohibits Merchant from selling or assigning future sales receivables to any third party.

9.4. Notwithstanding anything in this Agreement to the contrary, American Express shall have third-party beneficiary rights, but not obligations, to the terms of the Agreement applicable to American Express Card Acceptance to enforce such terms against Merchant.

9.5. Merchant must accept all card brands associated with this agreement at all of its business locations and websites, except as expressly permitted by state statute. Merchant is jointly and severally liable for the obligations of Merchant's business locations and websites under the Agreement. Merchant's refund policies must be the same for all card brands, and the refund policy must be disclosed to cardholders at the time of purchase and in compliance with all laws. In the event Merchant's participation in American Express Card Acceptance is terminated for any reason, Merchant must immediately remove all American Express branding and marks from Merchant's website and wherever else they are displayed.

9.6. Any and all cardholder information is confidential and the sole property of the applicable association or issuer. Except as otherwise specified, Merchant must not disclose cardholder information, nor use or store it, other than to facilitate sales at Merchant's business locations and websites.

9.7. American Express may use the information about Merchant obtained at the time of setup to screen and/or monitor Merchant in connection with American Express marketing and administrative purposes. Merchant agrees it may receive messages from American Express, including important information about American Express products, services, and resources available to its business. These messages may be sent to the mailing address, phone numbers, email addresses or fax numbers of Merchant. Merchant may be contacted at its wireless telephone number and the communications sent may include autodialed short message service (SMS or "text") messages or automated or prerecorded calls. Merchant agrees that it may be sent fax communications.

9.8. Merchant agrees that Bank may disclose to American Express information regarding Merchant and Merchant's sales to American Express, and that American Express may use such information to perform its responsibilities in connection with American Express Card Acceptance, promote American Express, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes within the parameters of American Express Card Acceptance, and important transactional or relationship communications from American Express.

9.9. American Express may use the information obtained in the Merchant Application at the time of setup to screen and/or monitor Merchant in connection with marketing and administrative purposes. On occasion, American Express may send out marketing communications to merchants. To opt out of receiving commercial marketing communications from American Express, send an email requesting "opt out of opt blue" with the MID and Legal or DBA Name to marcom@ndmscorp.com. Opting out of commercial marketing communications will not preclude Merchant from receiving important transactional or relationship messages from American Express.

9.10. American Express has the right to modify the Agreement with respect to American Express Card transactions or to terminate acceptance of American Express Card transactions and to require Bank to investigate Merchant activities with respect to American Express Card transactions.

9.11. Merchant acknowledges and agrees that it shall not assign to any third party any payments due under this Agreement as the result of American Express Card transactions, and all indebtedness arising from American Express Card charges will be for bona fide sales.

9.12. Bank shall have the right to terminate Merchant's participation in American Express Card Acceptance immediately upon written notice to Merchant (i) if Merchant breaches any of the provisions of this American Express OptBlue® Program Agreement, or any other terms of the Agreement applicable to American Express Card Acceptance, or (ii) for cause or fraudulent or other activity, or upon American Express' request. In the event Merchant's participation in American Express Card Acceptance is terminated for any reason, Merchant must immediately remove all American Express branding and marks from Merchant's website and wherever else they are displayed.

10. General Provisions.

10.1. Independent Contractor. In the performance of its duties herein, each party shall be an independent contractor, not an employee or agent of another party.

10.2. Cooperation. In their dealings with one another, each party agrees to act reasonably and in good faith and to fully cooperate with each other in order to facilitate and accomplish the matters contemplated by this Agreement.

10.3. Entire Agreement. This Agreement, together with the Application and any Schedules attached hereto, supersedes any other agreement, whether written or oral, that may have been made or entered into by any party (or by any officer or officers of any party) relating to the matters covered herein and constitutes the entire agreement of the parties hereto.

10.4. Assignment. This Agreement may not be assigned by Merchant without the prior written consent of Bank. Bank may assign this Agreement without limitation. Assignment of this Agreement by Bank shall relieve such party of any further obligations under this Agreement.

10.5. Captions. Captions in this Agreement are for convenience of reference only and are not to be considered as defining or limiting in any way the scope or intent of the provisions of this Agreement.

10.6. Governing Law, Jurisdiction and Venue. This Agreement shall be governed and construed in accordance with the laws of the State of California, without regard to internal principles of conflict of laws. Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of the federal or state courts of California in any action or proceeding arising out of or relating to this Agreement and irrevocably agrees that all claims in respect of such action or proceeding shall be heard and determined in the federal or state courts in Los Angeles, California.

10.7. Power of Attorney. Merchant appoints Bank as its attorney-in-fact to execute such documents as are necessary or desirable to accomplish perfection of any security interests. The appointment is coupled with an interest and shall be irrevocable as long as Merchant owes any amount to Bank.

10.8. Attorney's Fees. If Bank takes legal action against Merchant for any amounts due Bank herein, Merchant shall pay the costs and attorneys' fees incurred by Bank, whether suit is commenced or not.

10.9. Setoff. In addition to any other legal or equitable remedy available to it in accordance with this Agreement or by law, Bank may set off any amounts due to Bank under this Agreement against (i) any amounts which Bank would otherwise deposit to Merchant's Operating account, (ii) any other amounts Bank may owe Merchant under this agreement, or (iii) against any property of Merchant in the possession or control of Bank.

10.10. No Waiver. Any delay, waiver or omission by a party to exercise any right or power arising from any breach or default of the other party in any of the terms, provisions or covenants of this Agreement shall not be construed to be a waiver of any subsequent breach or default of the same or any other terms, provisions or covenants on the part of the other party. All remedies afforded by this Agreement for a breach hereof shall be cumulative.

10.11. Bankruptcy. Merchant shall notify Bank within five days upon filing of voluntary or involuntary bankruptcy proceedings by or against Merchant. The parties acknowledge that this Agreement constitutes an extension of financial accommodations by Bank to Merchant within the meaning of Section 365 of the Bankruptcy Code. The right of Merchant to receive any amounts due from Bank hereunder is expressly subject and subordinate to chargebacks, recoupment, lien, set-off and security interest rights of Bank regardless of whether such chargebacks, recoupment, lien, set-off and security interest rights are claims that are liquidated, unliquidated, fixed, contingent, matured or unmatured.

10.12. Force Majeure. Bank shall be excused from performing any of its obligations under this Agreement which are prevented or delayed by any occurrence not within Bank's control including but not limited to strikes or other labor matters, destruction of or damage to any building, natural disasters, accidents, riots or any regulation, rule, law, ordinance or order of any federal, state or local government authority.

10.13. Severability. If any provisions of this Agreement shall be held, or deemed to be, or shall, in fact, be, inoperative or unenforceable as applied in any particular situation, such circumstance shall not have the effect of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses or sections herein contained shall not affect the remaining portions of this Agreement or any part hereof.

10.14. Amendments to this Agreement. From time to time Bank may amend this Agreement as follows:

i. Amendment to Cards and/or Services. Bank may amend or delete Cards or Services listed in the Application by notifying Merchant in writing of any amendment with a minimum of 30 days prior written notice if reasonably practicable. All provisions of this Agreement shall apply to Cards or Services added to this Agreement. Bank shall notify Merchant of the fees to be charged for processing the additional Cards and Services. Acceptance by Merchant of a new approved Card as payment for a Transaction or use of a new Service after Bank has sent Merchant notice of an amendment shall constitute Merchant's agreement to the amendment and the fees or charges related to these additions.

ii. Amendment to Fees and Charges. Pass-through charges, including Association assessments, Program Fees and interchange, are outside the control of Bank and may be changed by other parties from time to time. Bank will provide Merchant with as much notice as is reasonably possible in the event of any such changes in pass-through charges. From time to time, Bank may change all non-pass through rates, fees and charges set forth in the Application. Bank will provide a minimum of 30 days written notice to Merchant of all amendments to non-pass through rates, fees and charges. Notice may be given on the Merchant Statement. All non-pass through rates, fees and charges will become effective for the month immediately following the month in which the notice appeared on the Merchant Statement unless Merchant terminates this Agreement in accordance with Section 5.3 ("Termination of Agreement by Merchant").

iii. Volume Adjustments. Bank may change the rates, fees and charges without prior written notice if Merchant's sales volume or average Transaction amount does not meet Merchant's projections contained in the Application.

10.15. Notices. Except for notices provided by Bank to Merchant on the Merchant Statement, all notices, requests, demands or other instruments which may or are required to be given by any party herein shall be in writing and each shall be deemed to have been properly given i) three business days after being sent by certified mail, return receipt requested, or ii) upon delivery by a nationally recognized overnight delivery service to the addresses listed herein for the respective parties. Notices shall be addressed as follows:

> If to Bank:
> **Chesapeake Bank**
> 5000 Foundation St
> Williamsburg, VA 23188
> Attn: Card Programs
> If to ISO:
> **National Discount Merchant Services**
> 1140 Highland Ave #193
> Manhattan Beach, CA 90266
> If to Merchant:
> **At the business address listed on the Application**

Any party may change the address to which subsequent notices are to be sent by notice to the others given as aforementioned.